# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| KELLEIGH LONIDIER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Case No. 4:13cv1075 TCM** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security ("the Commissioner"), denying Kelleigh Lonidier's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b. All matters are pending before the undersigned United States Magistrate Judge with consent of the parties pursuant to 28 U.S.C. § 636(c).

## Procedural History

Kelleigh Lonidier ("Plaintiff") applied for DIB and SSI in April 2010, claiming that she became disabled on January 31, 2010, because of schizoaffective disorder, gender identity disorder, personality disorder, and fibromyalgia. (R.[1] at 165-71, 172-74, 238.) Her

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

applications were denied initially and after a hearing held in August 2011 before administrative law judge ("ALJ") Victor L. Horton. (Id. at 8-23, 28-72, 76-78, 80-84.) After reviewing additional medical evidence,[2] the Appeals Council denied Plaintiff's request for review of the ALJ's decision, effectively adopting the ALJ's decision as the final decision of the Commissioner.[3] (Id. at 1-5.)

For the following reasons, the matter is reversed and remanded for further proceedings.[4]

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Jeffrey F. Magrowski, Ph.D., testified at the hearing.

At the time of the hearing, Plaintiff was thirty-eight years of age. She is single, has no children, and lives in a single-story house with a roommate. (Id. at 32-33, 51.) Plaintiff receives Medicaid and food stamp assistance. (Id. at 33-34, 39-40.)

---

[2]The additional evidence considered by the Appeals Council must also be considered by the Court when determining whether the ALJ's decision was supported by substantial evidence on the record as a whole. See **Frankl v. Shalala**, 47 F.3d 935, 939 (8th Cir. 1995); **Richmond v. Shalala**, 23 F.3d 1441, 1444 (8th Cir. 1994).

[3]Pursuant to a subsequent application for benefits, Plaintiff was found to be disabled as of December 31, 2011 – the date after the ALJ's final decision in this case.

[4]The ALJ found Plaintiff's fibromyalgia not to be a severe impairment. (Id. at 14.) Plaintiff does not challenge this determination nor any aspect of the ALJ's decision as it relates to any physical impairment. Accordingly, while the undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, the recitation of specific evidence in this Memorandum and Order is limited to only that evidence relating to the issues raised by Plaintiff in this appeal.

Plaintiff attended classes at a community college for one year. (Id. at 33.) She stopped attending in the spring of 2010 because it was "getting very hard for [her]." (Id. at 34.) She was taking three courses at the time – chemistry, German, and astronomy – and had a grade point average of 3.5. She had previously taken a college algebra course in 2003, and had earned an A in the class. (Id. at 34-35.) She had taken classes at a four-year college and had had to drop some courses because of her inability to concentrate and her occasional need to leave the classroom due to hallucinations. (Id. at 64-65.)

Plaintiff testified that she left her last job, working as a travel agent, because her employer began monitoring things very closely and she could not "handle it anymore." (Id. at 41.) She further testified that she could no longer work because she has schizoaffective disorder that causes her to have hallucinations. She was diagnosed with the condition one year prior but had experienced symptoms long before receiving a diagnosis. She currently took medication for the condition and experienced sleepiness as a side effect. (Id. at 46-47, 55-56.) Also, she has delusions that helicopters and secret people are monitoring her; she experiences these delusions on a daily basis. She has had auditory hallucinations for seven years; the voices tell her negative things. She had been able to work with these symptoms until they became worse. (Id. at 47-48.) She has difficulty leaving her house because she feels she is being watched or followed and feels that someone is hearing, stealing, or altering her thoughts. (Id. at 49-50.)

Plaintiff testified that she also has anxiety and cannot be in crowded places. Being around crowds causes her to "pick[] up thoughts from other people[.]" (Id. at 62.) In such circumstances, her heart beats rapidly, she has difficulty catching her breath, and she must "flee the situation." (Id. at 63.) She has the same reaction when she sees helicopters, airplanes, or government-looking trucks because she feels she is being watched. (Id.)

Plaintiff overdosed on Ambien but does not recall whether it was intentional. Also, she has engaged in self-mutilating behavior by cutting herself on the wrists. (Id. at 52-54.) She has been seeing a psychiatrist since February 2010. (Id. at 55.)

As to her daily activities, Plaintiff testified that she has pet birds and cleans their cages once a week. She prepares meals, does the dishes, and mows the lawn. She is able to take public transportation, but she occasionally changes her route in case someone is following her. (Id. at 50, 59.) She goes for walks, shops for groceries, reads, and researches her condition on the computer. (Id. at 51-52.) She has a driver's license, but has not driven since she last worked. (Id. at 57-58.) She has irregular sleep patterns, and naps throughout the day and evening. (Id. at 61-62.)

Dr. Magrowski, a vocational expert ("VE"), classified Plaintiff's past work as a billing/payroll clerk, reservation agent, and travel agent as sedentary and semi-skilled; as a parking attendant as light and unskilled; and as an airport supervisor as medium and semi-skilled. (Id. at 67.) He was asked by the ALJ to assume an individual of Plaintiff's age, education, and work experience who has no exertional limitations and who is able to

"[r]espond appropriately to supervisors, co-workers in a task-oriented setting where contact with others is casual and infrequent; perform repetitive work according to set procedures, sequence, and pace; and can perform complex tasks." (Id. at 68.) He testified that such a person could not perform any of Plaintiff's past work but could perform work as a data entry clerk, a file clerk, or an insurance clerk. (Id.) These three jobs exist in significant numbers in the state and national economies. (Id.)

If this same individual was limited to light work, Dr. Magrowski testified that she would be able to perform the same work as the previous hypothetical claimant. (Id. at 69.)

The ALJ then asked Dr. Magrowski to assume the individual to be limited to light work and was able to

> [u]nderstand, remember, carry out at least simple instructions, nondetailed tasks; maintain concentration and attention for two-hour segments over an eight-our [sic] period; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors, co-workers in a task-oriented setting, for contact with others casual and infrequent; adapt to routine simple work changes; perform repetitive work according to set procedure, sequence, and pace.

(Id.) Dr. Magrowski testified that such a person could perform work as a cleaner or as a bagger. (Id.) These jobs exist in significant numbers in the state and national economies. (Id.) If this same individual would have three additional absences each month because of her mental condition, there were no jobs she could perform without accommodation. (Id. at 70.)

Asked by Plaintiff's counsel to assume an individual who, because of psychologically-based symptoms, "could only apply common sense, understanding to carry

out simple one- to two-step instructions for a total of four to six hours during an eight-hour day, and could interact appropriately with the general public from two to four hours during an eight-hour day," Dr. Magrowski testified that such a person could not perform any of Plaintiff's past work and would be able to perform only part-time work. (Id. at 70.)

## Relevant Medical Records Before the ALJ

Plaintiff visited Dr. Jennifer Shashek, a psychiatrist with The Psychiatric Center, in February 2009 with complaints of being anxious. Plaintiff reported that her anxiety makes it difficult to work as a travel agent. She was also having panic attacks; during such episodes, people look to her like they were made of plastic. She gets paranoid and feels she is being monitored at work. She was having difficulty going into crowded places. She had taken antidepressants, but did not believe she was depressed. She did not have mood swings. She had not attempted suicide. She denied any suicidal or homicidal ideation and denied experiencing any visual or auditory hallucinations. Plaintiff further reported she had previously been diagnosed with bipolar disorder and schizophrenia. On examination, Plaintiff was cooperative, appropriately dressed and groomed, and had good eye contact. Her speech was noted to be rapid at times. She was noted to be fidgety and her legs shook. Her mood and affect were anxious; her thought process was circumstantial and tangential; her insight and judgment were fair. Dr. Shashek noted that Plaintiff laughed inappropriately. She diagnosed Plaintiff with bipolar disorder and anxiety disorder; assigned her a Global

Assessment of Functioning ("GAF") score of 50[5]; prescribed Lamictal and Zoloft; and instructed Plaintiff to begin therapy with Dr. Udziek. (Id. at 291-94.)

On March 4, Plaintiff reported to Dr. Shashek that she was doing a little better but was still anxious. Her feelings that people were out to get her had decreased. She was waking multiple times a night. She had no side effects from her medication. On examination Plaintiff was again cooperative, appropriately dressed and groomed, with good eye contact and with fair insight and judgment. Her right leg shook. Her speech was of regular rate, tone, and volume. Her mood was noted to be a little better and her affect was appropriate and within normal range. Her thought process was logical and goal-directed. She had no suicidal or homicidal ideations and no auditory or visual hallucinations. She had fair insight and judgment. Her diagnoses were unchanged. Dr. Shashek instructed Plaintiff to increase her medication and also prescribed Ambien. (Id. at 295.)

Plaintiff returned to Dr. Shashek two weeks later, reporting that she was doing a little better and that taking Ambien helped her to sleep. She continued to experience anxiety with social situations and large groups, and experienced a lot of anxiety at work. She reported feeling more coherent with Zoloft and less angry. On examination, she was as before with

---

[5]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

the exception of her speech being slow and her right arm and leg frequently shaking. Also, her mood was a little better; her affect was anxious; and her thought process was logical and goal-directed. Dr. Shashek's diagnoses were unchanged, as were Plaintiff's medications. (Id. at 296-97.)

Plaintiff returned to Dr. Shashek in April. She reported things were better in some ways and unchanged in others. She went out of her way to avoid certain people, but could not say why. She trusted only a few people. Plaintiff reported that Ambien continued to help her with sleep. Mental status examination showed Plaintiff's mood to be a little less nervous. Her affect was appropriate and within the normal range. Otherwise, she was as before. Dr. Shashek instructed Plaintiff to increase her dosage of Lamictal and continued her on her other medications as previously prescribed. (Id. at 298.)

On May 5, Plaintiff reported to Dr. Shashek that she had no memory of some recent behavior. She was instructed to decrease her dosage of Lamictal. (Id. at 299.)

Three days later, Plaintiff reported to Dr. Shashek that she continued to have episodes of forgetfulness and that she was experiencing panic associated with work. She also reported hearing voices, but denied any visual hallucinations. Her mood and affect were anxious. Plaintiff was continued on her current medications and was also prescribed Risperdal. (Id. at 300-01.)

Plaintiff visited Dr. Shashek on May 20, reporting Risperdal made her feel restless. Geodon was helping her continuing anxiety. She sometimes had panic attacks at night and heard voices. Klonopin (Clonazepam) was added to her medication regimen. (Id. at 303-04.)

Plaintiff returned to Dr. Shashek on June 10, reporting that people complained about her leg shaking and that she was moved at work to a place near a support team. She would become anxious if around a lot of noise. Geodon helped with her inner restlessness. She was feeling less paranoid and was not seeing things. Plaintiff's mood was noted to be okay, but anxious. Her affect was appropriate and within normal range. Dr. Shashek diagnosed Plaintiff with bipolar disorder and instructed Plaintiff to continue with therapy. Invega was added to her medication regimen. (Id. at 304, 306.)

On June 26, Plaintiff reported to Dr. Shashek that she continued to have gaps in her memory, including when driving. She sometimes felt that she was watching herself, and she was anxious at work. The Invega had no effect other than increasing her appetite. Plaintiff reported that her roommate thought she was acting more bizarrely with the medication. Geodon was more effective, but she could not afford it. She was instructed to discontinue Invega and to continue with her other medications. And, she was given samples of Geodon. (Id. at 305-06.)

On July 10, Dr. Shashek instructed Plaintiff to discontinue Ambien because of sleepwalking and prescribed trazodone instead. (Id. at 305.)

Plaintiff returned to Dr. Shashek on July 14, reporting having thoughts of being dead but having no suicidal plan or intent. She also reported hearing more voices. She would have to leave work because of anxiety. She felt okay if she was at home reading or painting. Her mental status examination was essentially normal, with her affect noted to be anxious. Her diagnosis of bipolar disorder remained; she was instructed to increase her dosage of Geodon. (Id. at 307.)

The same day, Plaintiff visited Dr. David J. Prelutsky, a general practitioner, and reported that her psychiatrist wanted some lab work done. Dr. Prelutsky noted that Plaintiff had begun to experience paranoid thoughts and auditory hallucinations several years prior for which she was placed on antipsychotics, including Geodon. He further noted that she continued to have such symptoms but was reportedly doing better. His diagnoses included suspected paranoid schizophrenia. Laboratory testing was ordered. (Id. at 281.)

Plaintiff returned to Dr. Shashek on July 28. She reported that she was doing okay but had been seeing things, particularly, spiders crawling under people's skin. She thought the spiders were coming from work. She was having a hard time at work because there were so many people around. She kept missing work. The Geodon made her rock back and forth or made her feel like rocking. And, she was having difficulty sleeping because she was hearing a radio through her mattress. Plaintiff reported that the things she saw at night were real but were on another plane of existence. Sometimes, she thinks they may not be real. Dr. Shashek noted that Plaintiff rocked back and forth at times during the appointment and spoke

slowly. She had a constricted affect and expressed worry about work. Plaintiff's insight and judgment were again described as fair. Her thought process was goal-directed but tangential. She was diagnosed with bipolar disorder with psychosis and was instructed to increase her dosage of Geodon; to continue with Zoloft, Lamictal, and Klonopin; and to contact an Employee Assistance Program counselor at her place of work. (Id. at 308-09.)

Three days later, on August 1, Plaintiff was admitted to St. John's Mercy Medical Center for evaluation of questionable psychotic symptoms and suicidal ideation, including thoughts of jumping off a bridge. She reported having auditory hallucinations of people telling her to run away, visual hallucinations of spiders coming out of her skin, and beliefs that people were stealing thoughts from her head. It was noted that Plaintiff had overdosed on Klonopin two weeks prior. Numerous superficial cuts were noted, with a reported long history of Plaintiff cutting on herself. Plaintiff's current GAF score was determined to be 50. During her hospitalization, with adjustments to her medication, Plaintiff's condition improved. She was discharged on August 4 in a stable and improved condition with continued anxiety but no suicidal ideation or ongoing psychotic symptomatology. She was instructed to follow up in the adult intensive outpatient program for ongoing care. On discharge, her diagnosis was schizoaffective disorder; her medications were Lamictal, Geodon, and Clonazepam; and her GAF score was 60.[6] (Id. at 322-26.)

---

[6]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

Plaintiff told Dr. Shashek when she saw her on August 27 that she was doing better. Dr. Shashek noted Plaintiff was working part time and taking classes. Plaintiff reported the classes gave her structure and something on which to concentrate. Her mental status examination was essentially normal, although her affect was slightly constricted and her leg shook. Dr. Shashek diagnosed Plaintiff with schizoaffective disorder and continued her on trazodone, Geodon, Klonopin, Lamictal, and Zoloft. (Id. at 310.)

In September, Plaintiff reported to Dr. Shashek that she was doing better but had increased anxiety because of tests. Plaintiff reported hearing voices and would undergo "a reality check" with her roommate. She was annoyed with people at work and was interested in getting an internship at the zoo. Her diagnosis was bipolar disorder; her medications were continued. (Id. at 311-12.)

In October, Plaintiff reported to Dr. Shashek that she was doing well at school but was paranoid in that she felt she was being videotaped. Plaintiff reported having no auditory hallucinations, but she was having visual hallucinations of seeing things dissolving into the wall. She was also having sleeping difficulties. Plaintiff described the mood at work as "resentful." Dr. Shashek diagnosed Plaintiff with bipolar disorder with psychosis and instructed her to increase the dosage of Lamictal. (Id. at 312-13.)

Plaintiff returned to Dr. Shashek in November, reporting increased paranoia in that she thought people at work were videotaping her. She was doing okay at school but had recently missed class because she was worried about being kidnaped and, consequently was

too afraid to leave her house. She had recently run out of Geodon; she could not afford the medication. Dr. Shashek questioned whether the recent increase in Lamictal had made any difference. Plaintiff requested that she be restarted on Risperdal. As before, on examination Plaintiff was cooperative, appropriately dressed and groomed, and had good eye contact and regular speech. Her legs were shaking. Her mood was anxious; her affect was constricted. Plaintiff's thought process was noted to be logical and goal-directed, but with some tangentiality. She had no suicidal or homicidal ideations. She was experiencing increased auditory and visual hallucinations and paranoia. Her insight and judgment were poor to fair. Her diagnoses and medications were unchanged. (Id. at 314-15.)

In December, Plaintiff reported to Dr. Shashek that Risperdal made her feel sick to her stomach and that a family member had agreed to pay for Geodon. Plaintiff continued to express feelings of paranoia with people from work and stated that she thought it was "some kind of corporate government thing." She was anxious when she went out. She was getting B's and C's in school. On examination Plaintiff's mood was anxious; her affect was anxious and constricted. Her thought process was circumstantial but goal-directed; her insight and judgment were fair. She denied any suicidal or homicidal ideations and any auditory or visual hallucinations. Increased paranoia was noted. Her diagnoses and medication regimen was unchanged with the addition of being restarted on Geodon. (Id. at 315-16.)

Plaintiff visited Dr. Shashek on January 22, 2010, reporting that the people at work were trying to drive her crazy and that she wanted to quit. Plaintiff also reported that an

organic machine was taking thoughts from her head and putting other ones in. She said things were okay at school but she was beginning to hear things and had to decrease her hours. Dr. Shashek noted that Plaintiff was fidgeting. Her mood was described as being not "too good" and her affect was anxious. Her thought process was delusional; her insight and judgment were poor. Zyprexa was added to her medication regimen. (Id. at 318.)

Three days later, Plaintiff was admitted to St. John's Mercy Medical Center with complaints of hallucinations, paranoia, and thoughts of harming herself and others. Plaintiff's admitting diagnosis was bipolar disorder with psychosis; her GAF score was 30.[7] It was noted that Plaintiff had been off of her mood stabilizer and antipsychotic medication because she could not afford it. She was restarted on Geodon and begun on Abilify. Plaintiff was discharged on January 29. She had no visual hallucinations, less frequent auditory hallucinations, and no thoughts of self-harm or of harming others. Her GAF score on discharge was 50. (Id. at 327-39.)

In February, Plaintiff reported to Dr. Shashek that she no longer had her job and that she was nervous about getting another one. School was going okay. Her mood was lighter; her sleep was okay. Plaintiff reported that she continued to hear voices but did not know what they said. She spoke at a slow rate. Her left leg was shaking. On examination, Plaintiff's mood was okay; her affect was constricted; her thought process was logical and

---

[7]A GAF score between 21 and 30 indicates the "[p]resence of hallucinations or delusions which influence behavior OR serious impairment in ability to communicate with others OR serious impairment in judgment OR inability to function in almost all areas." DSM-IV-TR at 34 (emphasis omitted).

goal-directed; her insight and judgment were fair. She had no suicidal or homicidal ideations. Occasional auditory hallucinations were noted. As before, she was diagnosed with bipolar disorder with psychosis and instructed to continue with her medications. (Id. at 317, 319.)

On March 3, Plaintiff was assessed by BJC Behavioral Health. Plaintiff reported having suicidal thoughts once or twice a week and that she previously engaged in cutting herself. She had diminished interest in activities and episodes of mania. She was suspicious and fearful of large crowds and avoided going to crowded public places. She had racing thoughts and auditory hallucinations. She reported that her previous employer monitored her thoughts and actions as part of a government operation; helicopters flying over her house monitor her thoughts and movements; and she avoids making purchases with credit cards so that no one can trace where she goes or what she does. She further reported having been diagnosed with bipolar disorder in 2005 or 2006 when she lived in North Carolina. Her recent mental health history was noted. It was opined that Plaintiff might be repressing significant gender identity issues. She was noted to experience depression and anxiety. It was further opined that Plaintiff's illness impaired her ability to work, complete her education, and meet basic needs and that she required intensive community mental health services to access psychiatric services and maintain independent living. It was also opined that Plaintiff met the criteria for "seriously mentally ill" and required face-to-face community support services to reduce the risk of repeated hospitalization. She was diagnosed with

personality disorder and gender identity disorder. Schizoaffective disorder was to be ruled out. Her current GAF score was 30. It was recommended that Plaintiff be considered for cognitive-behavioral therapy to learn coping skills to eliminate suicidal ideations, learn strategies for stress reduction, and address any gender identity concerns currently impacting her functioning. It was further recommended that Plaintiff work with vocational rehabilitation services to assist in pursuing employment when she is psychiatrically stable and, further, to continue in her college education when she is more stable. Plaintiff was referred to a clinical trial team for adult community support services and to Dr. Eileen Wu for psychiatric evaluation and treatment. It was suggested that a clinical social worker assist Plaintiff in applying for Medicaid and for disability based on psychiatric illness. (Id. at 349-62.)

The next day, Plaintiff visited Dr. Wu, who made the same observations and diagnoses as above and who assigned Plaintiff a GAF score of 50. Dr. Wu questioned Plaintiff's medication compliance. Plaintiff was prescribed Zoloft, Geodon, Bupropion, Lamictal, and Klonopin. (Id. at 363-64.)

On March 21, Plaintiff was admitted to St. John's Mercy Medical Center with thoughts of suicide, paranoia, and auditory hallucinations that commanded her to hurt herself and others. Plaintiff reported that she was part of a government plot to make her into a super soldier and that she had electronic implants that could read her thoughts. Dr. Matthew Wilson observed Plaintiff's reporting to seem a bit staged and stale but was hesitant to state

that she was malingering. Dr. Wilson noted that Plaintiff gave a "by-the-book" description of her condition rather than a clinical manifestation of symptoms. Dr. Wilson stated that Plaintiff nevertheless was paranoid and felt that people were plotting against her. Plaintiff's medications were noted to include Clonazepam, Lamictal, Zoloft, trazodone, and Geodon. A mental status examination showed Plaintiff to have no abnormal, involuntary movements; to have monotone speech; and to have significant thoughts of suicide as well as aggressive thoughts. Her flow of thought was goal-directed, sequential, and linear. No tangential or disordered thinking was noted. Her mood was noted to be depressed; her affect was dysthymic and flat. She was oriented times three, but her insight and judgment were fair to poor. Three days later, after developing a treatment and rehabilitation plan with BJC Behavioral Health, Plaintiff was discharged. (Id. at 340-45, 365-68.)

Plaintiff visited Dr. Wu again in April 7. Her general appearance and behavior were noted to be fair. Plaintiff was cooperative and described her mood as okay. Dr. Wu noted that Plaintiff did not have any suicidal or homicidal thoughts, but did have paranoid ideations and auditory hallucinations. She was restless. Plaintiff was oriented times three and had fair insight and judgment. Dr. Wu diagnosed her with schizoaffective disorder, gender identity order, and personality disorder. Dr. Wu added Remeron (Mirtazapine) and Propranolol to Plaintiff's medication regimen and instructed her to increase her dosage of Lamictal and to continue with Zoloft, Geodon, and trazodone. (Id. at 369-71.)

When Plaintiff next saw Dr. Wu, on May 5, her general appearance and behavior were noted to be fair. She was cooperative and described her mood as okay. Dr. Wu noted that Plaintiff did not have any suicidal or homicidal thoughts, delusions, or hallucinations. Her speech was appropriate; her psychomotor activity was normal; her insight and judgment were fair. Plaintiff was oriented times three. Her diagnoses were unchanged. Plaintiff was instructed to increase her dosages of Lamictal and Remeron. Ambien was added to her medication regimen. Plaintiff was given a statement excusing her from her current semester at school. (Id. at 403-06.)

Five days later, Dr. Wu reviewed Plaintiff's diagnosis with Plaintiff's case manager in relation to Plaintiff's application for SCLP (Supported Community Living Program). (Id. at 406.)

On June 6, Plaintiff went to the emergency room at St. John's Mercy Medical Center with reports of intense thoughts of harming herself by jumping off a parking garage. Plaintiff denied hearing voices and reported that an increase in Geodon helped keep the voices at bay. She was noted to be compliant with Geodon. Plaintiff was admitted – her GAF was then 30 – and begun on Lithium. She improved during the course of her hospitalization and was discharged on June 10 with a diagnosis of schizoaffective disorder, bipolar type, and a GAF of 65.[8] On discharge, she had a flat affect and better mood, improved insight and judgment,

---

[8]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

full orientation, no psychotic symptoms, sequential and goal-directed flow of thought, and intact associations. She was instructed to follow up with Dr. Wu and to stay active with her BJC Behavioral Health case worker. (Id. at 374-99.)

Dr. Wu met with Plaintiff's case manager on June 29 regarding Plaintiff's needs. (Id. at 406.)

Plaintiff returned to Dr. Wu on July 15, reporting that she planned to resume classes at the community college. It was noted that Plaintiff was no longer going to the Independent Center. Plaintiff reported having sleeping difficulties, being a little paranoid when she leaves the house, and having continuing, but improving, auditory hallucinations. Plaintiff was noted to be a little restless. Her medications were adjusted. (Id. at 406-09.)

On July 26, Dr. Elissa Lewis, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that Plaintiff's schizoaffective disorder resulted in moderate restrictions in maintaining social functioning and mild restrictions in activities of daily living and in maintaining concentration, persistence, or pace. The disorder did not cause any repeated episodes of decompensation of an extended duration. (Id. at 410-21.) In a Mental Residual Functional Capacity Assessment completed that same date, Dr. Lewis opined that Plaintiff was not significantly limited in any domain of functioning, including in Understanding and Memory, Sustained Concentration and Persistence, Social Interaction, and Adaptation. Dr. Lewis opined that Plaintiff was able to sustain gainful employment when she is medication

compliant, as long as the employment did not require working closely with others. (Id. at 422-24.)

Two days later, Plaintiff was admitted to St. Mary's Health Center after overdosing on Ambien. She reported she had had no intention to overdose, but she also indicated that she was tired of living. Plaintiff also reported having no memory as to why she came to the hospital. She was admitted for suicide precaution. During her hospitalization, Plaintiff underwent individual, group, and milieu psychotherapy as well as medication management. She was discharged on August 1 in fair condition and with questionable prognosis. (Id. at 426-47.) Plaintiff's case manager informed Dr. Wu of her hospitalization. (Id. at 454.)

Plaintiff saw Dr. Wu in September. She noted that Plaintiff continued to have auditory hallucinations and had no suicidal or homicidal thoughts or delusions. Dr. Wu prescribed Trileptal and instructed Plaintiff to continue with her other medications. (Id. at 455-57.) Dr. Wu noted that it was difficult to track Plaintiff's medications because of her frequent hospitalizations. (Id. at 454.)

In October, Plaintiff reported to Dr. Wu that she had begun taking classes at a community college but felt anxious when she got home from school. Plaintiff also reported being a little paranoid when leaving the house. She was having difficulty sleeping and was still having auditory hallucinations. Dr. Wu observed Plaintiff to be a little restless. Not much depression was noted. Plaintiff had no suicidal or homicidal thoughts. Plaintiff was instructed to increase her dosage of Trileptal. On that same date, Dr. Wu completed a

"disability verification of psychiatric disabilities" for the community college. (Id. at 457, 460.)

On November 17, Dr. Wu instructed Plaintiff to discontinue Lithium because of continuous nausea and to increase her dosages of Trileptal and trazodone. These instructions were also provided to Plaintiff's case manager. (Id. at 460.)

Plaintiff returned to Dr. Wu on November 30, reporting continued nausea even when not taking Lithium. Plaintiff associated her nausea with her anxiety. Plaintiff continued to have some paranoia when leaving the house. Severe anxiety was noted. Plaintiff was instructed to discontinue Zoloft; Celexa (Citalopram) was prescribed. Plaintiff was instructed to continue with Geodon as prescribed and to increase her dosages of Trileptal and trazodone. (Id. at 461-63.)

In December 28, Plaintiff reported having continuing auditory hallucinations and problems sleeping, but no nausea. She was noted to be anxious. Her dosages of Celexa, Trileptal, and trazodone were increased. (Id. at 464-66.)

In January and February 2011, Plaintiff continued to report the same complaints to Dr. Wu. It was noted that Plaintiff had to drop her chemistry class at community college but enjoyed her other classes. (Id. at 467-69, 470-72.) In March, Dr. Wu noted that Plaintiff was doing okay with her two college classes. She continued to have auditory hallucinations, albeit they had improved. She was continued on her medications. (Id. at 473-75.)

Also in March, Plaintiff was evaluated by the BJC Behavioral Health Community Mental Health Center. She reported symptoms of having self-destructive impulses, feelings of worthlessness and hopelessness, auditory and visual hallucinations, suspiciousness, forgetfulness, and difficulty paying attention and concentrating. She was diagnosed with schizoaffective disorder, gender identity disorder, and personality disorder. Her GAF was 53. An Integrated Recovery Plan was put in place and periodically reviewed. (Id. at 482-91.)

In April, Plaintiff reported to Dr. Wu that she felt anxious, continued to experience some paranoia and auditory hallucinations, and was a little restless. She had no suicidal or homicidal thoughts. She was instructed to discontinue Trileptal because of its side effects and to begin taking Neurontin (gabapentin). (Id. at 476-78.)

In May, Plaintiff reported feeling more anxious. Her dosage of Neurontin was increased. (Id. at 479-81.)

In June, Dr. Wu completed a Mental Medical Source Statement ("MMSS") in which she opined that, in the domain of activities of daily living, Plaintiff experienced marked limitations in her abilities to cope with normal stress and behave in an emotionally stable manner; moderate limitations in her abilities to maintain reliability and adhere to basic standards of neatness and cleanliness; and no limitations in her ability to function independently. In the domain of social functioning, Plaintiff was markedly limited in her ability to interact with strangers or the general public; moderately limited in her ability to accept instructions or respond to criticism; mildly limited in her ability to relate to family,

peers, or caregivers; and not limited in her abilities to ask simple questions, request assistance, or maintain socially acceptable behavior. In the domain of concentration, persistence, or pace, Dr. Wu opined that Plaintiff was markedly limited in her abilities to perform at a consistent pace without an unreasonable number and length of breaks and to respond to changes in a work setting; moderately limited in her abilities to maintain attention and concentration for extended periods and sustain an ordinary routine without special supervision; and not limited in her ability to make simple and rational decisions. Dr. Wu further opined that Plaintiff could apply commonsense understanding to carry out simple one- or two-step instructions for four to six hours in an eight-hour workday and could interact appropriately with the general public for up to four hours in an eight-hour workday. She would miss work, be late to work, or need to leave work early at least three days a month because of her psychologically-based symptoms. Dr. Wu reported that Plaintiff had experienced these limitations since March 2010. (Id. at 492-95.)

In September, Plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff's clinical caseworker from BJC Behavioral Health brought Plaintiff to the evaluation. Dr. Michael T. Armour noted that Plaintiff's current medications included Geodon, Mirtazapine, trazodone, Haloperidol (Haldol), gabapentin, and Citalopram. Plaintiff reported that she could not work because she was too afraid to leave her house on account of her fear that she was being watched. Also, she saw helicopters, which made feel she was being watched. She believed that someone had put "secret stuff"

in her room that caused her not to keep thoughts in her head. She intercepted other people's thoughts; her own thoughts were stolen by radio waves and stored on a computer. The government was involved in this process. She did not have any visual hallucinations, but did have auditory hallucinations that happened more frequently when she was trying to go to sleep. Plaintiff reported feeling depressed and having past episodes of excessive energy and racing thoughts. Results of the Trails A and B tests showed Plaintiff to score in the impaired range, indicating that she performs visual sequencing and problem-solving tasks significantly more slowly than the average person of her age and education level. The results of the Minnesota Multiphasic Personality Inventory ("MMPI") test produced an invalid profile as a result of inconsistent responses, rare or unusual symptoms, possible over-reporting of memory problems, and somatic complaints. Dr. Armour noted, however, that such scores did not mean that Plaintiff did or did not have her reported symptoms; only that the administration of the MMPI could not be interpreted. Mental status examination showed Plaintiff to be cooperative and casually dressed in clean clothing, but disheveled. She had a constant tremor in her left leg. Her mood was anxious; her affect was limited and flat; her memory was intact and adequate; her insight and judgment were adequate for her safety. Dr. Armour determined that the results of the evaluation were a valid sample of her current functioning. He diagnosed Plaintiff with schizoaffective disorder, anxiety disorder, gender identity disorder, and personality disorder and assigned a GAF score of 40-45. In an MMSS that same date, Dr. Armour opined that Plaintiff experienced mild limitations in her ability

to understand and remember instructions; marked limitations in her ability to interact appropriately with supervisors, coworkers, and the general public; severe limitations with sustained concentration and persistence; and moderate to severe limitations with social functioning and adaptation. (Id. at 498-512.)

The next month, Plaintiff was admitted to St. John's Mercy Medical Center with thoughts of suicide and reports of wanting to jump off a bridge. Plaintiff reported that her depression was worsening and she was having auditory hallucinations encouraging her to commit suicide. Geodon and Haldol helped decrease the voices. Plaintiff also reported increased paranoia in that helicopters were trying to control her. She had been unable to sleep or concentrate for the past several weeks, and was experiencing increased isolation and a poor appetite. On admission, Plaintiff had a flat affect; constantly-tapping foot; and disheveled appearance and poor hygiene. Plaintiff reported feeling overwhelmed in school. During her hospitalization, Plaintiff improved and stabilized with psychotherapy and adjustments to her medications. She was discharged three days after admission with a diagnosis of schizoaffective disorder with improved mental status. A GAF score of 65[9] was assigned, with a notation that Plaintiff had "serious symptoms." Her medications on discharge included trazodone, Geodon, Haldol, Lamictal, Celexa, and Ambien. (Tr. 513-43.)

---

[9]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

## The ALJ's Decision

The ALJ first found Plaintiff met the insured status requirements of the Act through March 31, 2015, and had not engaged in substantial gainful activity since her alleged disability onset date of January 31, 2010. The ALJ next found that Plaintiff's schizoaffective disorder, gender identity disorder, and personality disorder were severe impairments, but she did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 11-16.)

The ALJ found Plaintiff to have the residual functional capacity ("RFC") to perform work at all exertional levels and that she could

> understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task oriented setting where contact with others is casual and infrequent; adapt to routine, simple work changes; and perform repetitive work according to set procedures, sequence, or pace.

(Id. at 16.) Plaintiff could not, however, perform any past relevant work. The ALJ determined that considering Plaintiff's age, education, work experience, and RFC, the vocational expert testimony supported a finding that Plaintiff could perform other work as it exists in significant numbers in the national economy; specifically, work as a cleaner or bagger. Plaintiff was not, therefore, disabled within the meaning of the Act. (Id. at 16-23.)

**Additional Medical Records Submitted to the Appeals Council**

In February 2012, Dr. Wu instructed Plaintiff to increase her dosage of Lamictal. One month later, she instructed Plaintiff to further increase her dosage. (Id. at 546.)

**Discussion**

To be eligible for DIB and SSI under the Act, Plaintiff must prove that she is disabled. See **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001); **Baker v. Secretary of Health & Human Servs.**, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; **Bowen v. Yuckert**, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination

of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); **Richardson v. Perales**, 402 U.S. 389, 401 (1971); **Estes v. Barnhart**, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. **Johnson v. Apfel**, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." **Coleman v. Astrue**, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." **Id.** (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

**Stewart v. Secretary of Health & Human Servs.**, 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. **Coleman**, 498 F.3d at 770; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. **Pearsall**, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." **Weikert v. Sullivan**, 977 F.2d 1249, 1252 (8th Cir. 1992)

(internal quotation marks and citation omitted); see also **Jones ex rel. Morris v. Barnhart**, 315 F.3d 974, 977 (8th Cir. 2003).

In this cause, Plaintiff challenges the manner and method by which the ALJ determined her RFC, arguing that no medical opinion evidence corresponds with the RFC determination and, further, that the ALJ improperly weighed the medical opinion evidence of record. Plaintiff also claims that the ALJ erred in his analysis finding Plaintiff's subjective complaints not to be credible and failed to undergo the regulatory analysis required for chronic mental illness. For the following reasons, the matter will be remanded for further consideration.

Opinion Evidence. In evaluating opinion evidence, the Regulations require the ALJ to explain the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. See 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).[10] The Regulations also require that more weight be given to the opinions of treating physicians than of other sources. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also **Forehand v. Barnhart**, 364 F.3d 984,

---

[10]Citations to 20 C.F.R. 404.1527 and 416.927 are to the 2011 edition of the Regulations in effect at the time the ALJ rendered his decision. The Regulations most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the substance therein.

986 (8th Cir. 2004).  This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ accorded less than significant weight to Dr. Wu's June 2011 MMSS, finding it to be inconsistent with substantial evidence on the record and to possibly be influenced by sympathy for Plaintiff and/or Plaintiff's demands for supportive reports.  (See R. at 20-21.)  The ALJ also accorded little weight to Dr. Armour's September 2011 MMSS,

finding it to be inconsistent with other evidence of record and to be based on Plaintiff's exaggeration and possible over-reporting of symptoms. (See id. at 20.) Finally, the ALJ accorded great weight to Dr. Lewis's July 2010 opinion, finding it to be consistent with the objective medical evidence. (See id. at 21.) For the following reasons, the ALJ erred in the process by which he weighed the opinion evidence of record.

Dr. Wu. The ALJ accorded less than significant weight to the opinion of Dr. Wu, Plaintiff's treating psychiatrist, because it "was not supported by objective clinical findings and was inconsistent with other substantial evidence." (Id. at 20.) Other than referring generally to his previous discussion, the ALJ does not identify the other evidence of record of which Dr. Wu's opinion runs afoul, nor does a review of the record demonstrate any. Absent some explanation for finding an inconsistency where none appears to exist, the ALJ's cursory determination to discount this treating physician's opinion does not constitute a good reason supported by the record. See **Reed v. Barnhart**, 399 F.3d 917, 921 (8th Cir. 2005).

The ALJ also discounted Dr. Wu's opinion for the reason that

[t]he possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension.

(R. at 20-21.) This explanation does not provide a sufficient basis upon which to discount Dr. Wu's MMSS. There is no evidence in the record suggesting that Dr. Wu completed the

assessment out of sympathy or in an effort to avoid doctor/patient tension.  Nor is there evidence suggesting that Plaintiff was insistent in any way in obtaining certain opinions from Dr. Wu.  Without any evidence demonstrating that Plaintiff or her treating psychiatrist engaged in the inappropriate conduct alluded to by the ALJ, it was error for the ALJ to discount the opinion of this treating psychiatrist on this basis.  On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Wu's opinion and support his reasons with evidence from the record.

        <u>Dr. Armour.</u>  The ALJ accorded little weight to the September 2011 opinion of Dr. Armour, a consulting examining psychologist, finding it to be contrary to other evidence of record.  As with Dr. Wu's opinion, the ALJ fails to describe the inconsistency with the other evidence of record, generally referring instead to his discussion in the decision. (R. at 20.)  This cursory reason is insufficient to discount the opinion of this examining psychologist.  <u>See</u> **Reed**, 399 F.3d at 921.

The ALJ also discounted Dr. Armour's opinion evidence based on Dr. Armour's comments regarding Plaintiff's possible exaggeration and over-reporting of symptoms.  The evidence shows, however, that Dr. Armour did not characterize these observations in such a manner so as to invalidate his findings and opinions made thereon.  Indeed, a review of Dr. Armour's evaluation shows the contrary.  During the evaluation, Dr. Armour observed Plaintiff's behavior and extensively interviewed Plaintiff regarding her background and current condition.  Dr. Armour also reviewed medical evidence from The Psychiatric Center,

BJC Behavioral Health, and Plaintiff's hospitalizations. Dr. Armour conducted a mental status examination and administered the Trails A and B tests and the MMPI. He noted the MMPI results showed Plaintiff's scores on the internal consistency scales to be significantly elevated, indicating that Plaintiff did not respond in a consistent manner across test items. Dr. Armour further noted that Plaintiff scored in the significant range on measures of rare or unusual symptoms. Finally, Dr. Armour noted that other validity measures indicated "possible over-reporting of memory problems and somatic complaints." (R. at 501.) Significantly, however, Dr. Armour stated that "[t]hese elevated validity scores do not mean that Ms. Lonidier does or does not have her reported symptoms but that this administration of the MMPI-2-RF cannot be interpreted." (Id.) Indeed, Dr. Armour reported that the psychological evaluation overall, considered in its entirety, was "a valid sample of [Plaintiff's] current level of functioning." (Id.) The ALJ's misapprehension as to Dr. Armour's observations is not good reason to discredit his opinion.

Dr. Lewis. The ALJ accorded great weight to the July 2010 Mental RFC Assessment completed by Dr. Lewis, a non-examining psychological consultant with disability determinations, finding only that it was "reasonable and consistent with the objective medical evidence" of record. According great weight to this assessment was error.

Opinions of non-treating, non-examining sources ordinarily do not constitute substantial evidence on the record as a whole and are generally accorded less weight than opinions from examining sources. **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010);

**Wildman v. Astrue**, 596 F.3d 959, 967 (8th Cir. 2010). This is especially true when evidence contrary to the non-examining source's opinion exists in the record. See **Davis v. Schweiker**, 671 F.2d 1187, 1189 (8th Cir. 1982). When evaluating the opinion of a non-examining source, the ALJ must evaluate the degree to which the opinion considers all of the pertinent evidence, including opinions of treating and other examining sources. **Wildman**, 596 F.3d at 967; 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Additionally, where the non-examining source did not have access to relevant medical records, the opinion is accorded less weight. See **McCoy v. Astrue**, 648 F.3d 605, 616 (8th Cir. 2011).

Here, Dr. Lewis rendered her opinion in July 2010 and thus did not have access to numerous and significant medical records created thereafter that showed additional psychiatric hospitalizations, continued participation in and evaluation by BJC's Behavioral Health program, continual prescriptions for and adjustments to psychotropic medications, and Plaintiff's transient response and continued symptoms despite medication compliance. Because Dr. Lewis did not have access to these relevant records when she rendered her opinion, the opinion of this non-examining consultant is entitled to less weight. See **McCoy**, 648 F.3d at 616. Also, Dr. Lewis did not have the opportunity to consider the opinions of Plaintiff's treating and examining sources inasmuch as such opinions were rendered in June and September 2011, that is, eleven to fourteen months after Dr. Lewis's opinion. The ALJ did not consider Dr. Lewis's lack of access to this opinion evidence and, as discussed supra, improperly discounted such evidence. To accord great weight to Dr. Lewis's opinion

evidence in these circumstances was error.  See **Wildman**, 596 F.3d at 967; **Davis**, 671 F.2d at 1189.

The Regulations require that more weight be given to the opinions of treating physicians than other sources.  Indeed, the opinions of treating physicians are generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians.  Although the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources, and to provide good reasons for according less than controlling weight to the opinions of treating physicians, the ALJ's explanation here regarding the weight given to each of such opinions in this case is less than adequate and is not supported by substantial evidence on the record as a whole.

Credibility Determination.  Plaintiff challenges the ALJ's finding that her subjective complaints of disabling symptoms were inconsistent with the medical evidence of record and not credible.  For the following reasons, the ALJ's credibility determination is not supported by substantial evidence on the record as a whole.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions.  **Halverson v.**

**Astrue**, 600 F.3d 922, 931 (8th Cir. 2010); **Polaski v. Heckler**, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need not explicitly discuss each *Polaski* factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints. **Wildman**, 596 F.3d at 968.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." **Masterson v. Barnhart**, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. **Id.** at 738; see also **Cline v. Sullivan**, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. **Hogan v. Apfel**, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005); **Pearsall**, 274 F.3d at 1218.

In the instant case, the ALJ discounted Plaintiff's credibility based on her "history of noncompliance with medications." (R. at 18.) In support of this finding, the ALJ cites Dr. Prelutsky's office treatment note of July 14, 2009, and Plaintiff's hospitalization in January

2010. Nothing in Dr. Prelutsky's note indicates that Plaintiff had not been compliant with her medications. Nor do the January 2010 hospital records demonstrate a history of noncompliance. Instead, the records show that Plaintiff had run out of her medications a few days prior and was financially unable to refill them. Plaintiff was only able to restart the desired medication after a family member agreed to pay for it. Cf. **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004) (lack of sufficient financial resources may justify noncompliance with prescribed treatment). The Eighth Circuit has repeatedly recognized that a mentally ill claimant's noncompliance with treatment can be, and ordinarily is, the result of the mental impairment itself and cannot, with nothing more, be deemed willful or unjustifiable to such an extent that the claimant's subjective complaints relating thereto should be discredited. See **Pate-Fires v. Astrue**, 564 F.3d 935, 945-47 (8th Cir. 2009) (and cases cited therein). Plaintiff's isolated instance of medication noncompliance is in itself an insufficient basis upon which to find a "history of noncompliance" sufficient to undermine the credibility of her subjective complaints of disabling psychiatric symptoms.[11]

The ALJ also determined that Plaintiff's complaints of experiencing persistent disabling symptoms every day were inconsistent with medical evidence demonstrating that her symptoms improved with each hospitalization. (R. at 18.) This basis for discrediting

---

[11]In her brief, the Commissioner cites to evidence of Plaintiff's drug overdose, for which she was hospitalized and placed on suicide precaution, to support the ALJ's finding that Plaintiff did not take her medication as prescribed. (Def.'s Br. at 6, ECF No. 23, citing R. at 426, 429-30.) The Court declines to consider a suicide attempt as a factor to be weighed against the credibility of a claimant alleging a disabling mental impairment.

Plaintiff's complaints ignores the Regulations' directive to consider the extent to which a claimant with a chronic mental impairment can function *outside* such structured settings:

> Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(E).

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. . . . Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(F).

Here, the ALJ focused on Plaintiff's ability to function *within* the structured hospital setting when finding her complaints were not credible. The ALJ did not consider the extent to which the hospital setting itself reduced Plaintiff's symptomatology because of its structure and constant monitoring of Plaintiff's condition. To find Plaintiff's complaints not credible because of her improved condition during psychiatric hospitalizations was error.

To the extent the ALJ discredited Plaintiff's complaints because of her attendance at college and other normal daily activities, the undersigned notes that Plaintiff withdrew from

her classes during the 2010 spring semester upon Dr. Wu's written statement. And, Dr. Wu provided a "disability verification of psychiatric disabilities" to the community college in October 2010. Upon resuming classes in the 2011 spring semester, Plaintiff again withdrew from a class but was able to continue with two others. Additional evidence shows Plaintiff to have missed classes and reduced her hours because of manifested symptoms of her mental impairment. In addition, the normal daily activities cited by the ALJ, i.e., preparing meals, taking out the garbage, doing laundry, mowing the lawn, grocery shopping, and reading and watching television, are not of sufficient quality or do not sufficiently demonstrate independence to discredit Plaintiff's complaints of disabling mental symptoms. See **Reed**, 399 F.3d at 923-24. This is especially noteworthy here because Plaintiff altered her behavior due to her psychotic manifestations and was continually monitored and assisted by a clinical caseworker through BJC Behavioral Health. Cf. **Andler v. Chater**, 100 F.3d 1389, 1393 (8th Cir. 1996) (noting Regulations' recognition that individuals with chronic psychotic disorders commonly structure their lives in such a way as to minimize stress and reduce their signs and symptoms) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)).

The ALJ further discredited Plaintiff's claim that she could not now work because she had worked for approximately seven years with her alleged disabling symptoms at their current level of severity. Contrary to this finding, however, substantial testimonial and medical evidence demonstrates that Plaintiff's symptoms indeed worsened during the latter half of 2009, leading Plaintiff to miss work, reduce her hours, be hospitalized twice for

psychiatric treatment, and ultimately terminate her employment in January 2010. The evidence further shows Plaintiff's condition continued to deteriorate, leading to additional hospitalizations, increased dosages of multiple psychotropic medications, and monitoring by a Behavioral Health caseworker. Where a claimant has worked with an impairment in the past *and* there is no evidence of significant deterioration, an ALJ may find that the impairment is not disabling in the present. See **Goff v. Barnhart**, 421 F.3d 785, 792-93 (8th Cir. 2005). In this case, however, there is substantial evidence demonstrating that Plaintiff's mental impairment *did* deteriorate and adversely affect her ability to work. The ALJ's determination otherwise is not supported by the record.

Finally, to the extent the ALJ refers to Dr. Wu's recent treatment notes demonstrating that Plaintiff currently was "a little" paranoid leaving the house, had "improved" with respect to her auditory hallucinations, and was "not much" depressed, Record at 18, the Court notes that recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation. See **Rowland v. Astrue**, 673 F. Supp. 2d 902, 920-21 (D. S.D. 2009) (citing Jones v. Chater, 65 F.3d 102, 103 (8th Cir. 1995)). As noted by the Eighth Circuit, "[i]t is inherent in psychotic illnesses that periods of remission will occur[.] . . . Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." **Andler**, 100 F.3d at 1393 (first alteration added) (internal quotation marks and citations omitted). Because a claimant's level of mental functioning may seem relatively adequate at a specific time, proper evaluation of the impairment must take into account a

claimant's level of functioning "over time." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(D)(2). Here, the longitudinal picture of Plaintiff's mental impairment shows her to continue to exhibit symptoms of psychotic illness even through periods of regular treatment and "improvement." It cannot be said, therefore, that such limited improvement constitutes a sufficient basis upon which to discredit Plaintiff's subjective complaints. Indeed, an articulated "improvement" in a chronic schizophrenic is not inconsistent with a finding of disability where, as here, a claimant's treating psychiatrist has not discharged her from treatment and requires frequent appointments, and another medical source has concluded that her work skills are deficient. See **Hutsell v. Massanari**, 259 F.3d 707, 712-13 (8th Cir. 2001).

Accordingly, this matter must be remanded for an appropriate analysis of Plaintiff's credibility in the manner required by and for the reasons discussed in *Polaski*. See **Butler v. Secretary of Health & Human Servs.**, 850 F.2d 425, 428-29 (8th Cir. 1988).

RFC Determination. Because "[s]ubjective complaints . . . are often central to a determination of a claimant's RFC," **Fredrickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004), an ALJ's RFC assessment based on a faulty credibility determination is called into question because it does not include all of the claimant's limitations. See **Holmstrom v. Massanari**, 270 F.3d 715, 722 (8th Cir. 2001). This is especially true where an ALJ fails to properly consider evidence of a claimant's mental impairment. See **Pate-Fires**, 564 F.3d at 944-45 (ALJ's failure to properly evaluate evidence of mental impairment resulted in RFC

not supported by substantial evidence). Additionally, given the ALJ's improper discounting of the medical opinions of Plaintiff's treating and examining sources, Drs. Wu and Armour, together with his unsupported determination to accord great weight to the opinion of a non-examining State agency consultant, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole. See e.g. **Leckenby v. Astrue**, 487 F.3d 626 (8th Cir. 2007).

## Conclusion

For the foregoing reasons, the ALJ failed to properly evaluate Plaintiff's credibility and improperly analyzed the opinion evidence of record in this cause, resulting in an RFC determination that was not supported by substantial evidence on the record as a whole. The matter will therefore be remanded for further consideration. Although the undersigned is aware that upon remand, the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of June, 2014.